Filed 1/3/22  In re Q.B. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re Q.B. et al., Persons Coming Under the Juvenile Court Law. | B306789 |
| _____ | Los Angeles County |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | Super. Ct. No. 19CCJP07897A-B |
| Plaintiff and Respondent, | |
| v. | |
| S.G., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Martha A. Matthews, Judge.  Affirmed.

Roni Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Jane Kwon, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

A mother appeals from the juvenile court's jurisdictional and dispositional orders regarding her two children. We affirm the jurisdictional order. We dismiss the appeal of the dispositional order as moot and, in the alternative, affirm on the merits. Undesignated statutory references are to the Welfare and Institutions Code.

## I

We recount the factual and procedural background.

## A

The mother has two children, Q.B., age 12, and Z.S., age seven.

Q.B. has been diagnosed with attention-deficit/hyperactivity disorder, borderline autism, anxiety, depression, and an unspecified disorder concerning impulse control and disruptive conduct. As part of his individualized educational program, he attends school with a one-on-one aide. He also attends therapy. He has made suicidal threats at school, including holding scissors and pencils to his neck.

In the summer of 2017, when Q.B. was eight and Z.S. was three, the mother left the children in the care of their maternal uncle while the mother was at work. The uncle lived with the maternal grandmother.

In July of 2017, Z.S.'s preschool teacher told the mother Z.S. was stroking herself in a masturbatory way while changing her clothes. When asked about the behavior, Z.S. said Q.B. touched her there and that her uncle may have touched her inappropriately. The mother asked Q.B. about what Z.S. said. Q.B. admitted to touching Z.S., but later said he did not. He reported the uncle had shown the children pornography on his phone and told Q.B. to insert a Q-tip inside Q.B.'s anus.

2

The mother took the children to the police station and filed a report against the uncle. The Los Angeles County Department of Children and Family Services interviewed the mother and the children. The children underwent forensic exams that produced normal results. The Department closed the investigation as inconclusive, noting the mother had been appropriately protective of her children.

In August 2017, Q.B. came to school with a big cut on his forehead. Q.B. said he had gotten it when his mother pushed him into a wooden post. After interviewing the mother and Q.B., the Department closed the investigation as inconclusive.

In July 2019, Q.B. was acting out. When the mother asked him about it, he said "he can't take it anymore and can't get it out of his head." He said the uncle had sodomized both him and Z.S. in 2017. The mother took the children back to the police station to file another report. Q.B. did not want to talk about the incident, but he said what his mother said was true. Z.S. similarly answered yes when asked if the uncle had done anything bad to her and her brother, but she did not want to say what happened. Because the children no longer had contact with the uncle or grandmother and the mother acted to protect the children, the Department found there was no current risk or safety concern.

In August 2019, forensic interviewers spoke to each child. In his interview, Q.B. repeated that his uncle had sodomized him and made him put things in his anus. Q.B. said he saw pornography on his uncle's phone but denied the uncle told him to watch it. Q.B. also reported his uncle had touched Q.B.'s penis, made Q.B. lick the uncle's penis, and made Q.B. put his penis in Z.S.'s vagina. Q.B. further reported his uncle had taken

3

him and Z.S. to a farm. Some of Q.B. and Z.S.'s classmates were also at the farm. The uncle killed 18 animals and made Z.S. drink cow's blood. The uncle had also forced the children to watch satanic rituals and drink cleaning detergent. In her interview, Z.S. also described satanic rituals. She said these took place at her grandmother's home with her uncle's friends and that some of her classmates were there. Z.S. said her uncle had shown them pornography once. She also reported her uncle had told a boy at her school to kiss her and a girl to shake her butt. Z.S. said her uncle told her and Q.B. to eat poop. Z.S. said her uncle peed on her private parts and the uncle's friend put his "dooty" in her private. Z.S. also reported that her uncle had killed animals at a farm with a gun. She said her uncle made Q.B. drink the blood of a cow. She denied her uncle had touched her or Q.B. inappropriately or made them touch each other inappropriately. Forensic exams of the children were normal and could neither confirm nor rule out sexual abuse.

The children largely repeated these claims when interviewed by the Department, elaborating on certain statements. Q.B. stated his uncle had killed a man, his grandmother had cooked the man, and they made the children eat him. He also claimed the police had come to his grandmother's house and molested the children.

The mother was also interviewed about the children's statements. The mother's account varied in some respects from her earlier reports to the police and changed during the interview, especially regarding timing. The mother said Q.B. told her both children had been forced to eat poop and drink pee. She also said the children had been part of rituals four times at various houses and once at a farm. The rituals included drawing

4

stars, putting animals or bugs on the children, and then raping the children. She said the children reported their classmates' fathers dropped them off for these rituals and the uncle paid the fathers. When the Department spoke to the mother, she made similar statements, including that she believed the grandmother was running a child prostitution sex ring.

The uncle denied touching the children inappropriately or participating in satanic rituals. He said he had never taken the children anywhere on his own. The uncle refused to take a polygraph because he was nervous. The grandmother also denied sexually abusing Q.B. She told police the uncle had not taken the children anywhere because he does not drive and does not know how. The grandmother described the mother as "a big manipulator." She believed the mother was coaching the children to say the uncle abused them. She refused to take a polygraph test, saying she was too upset.

In September 2019, the mother reported to the Department that Q.B. had disclosed that the grandmother had forced him to orally copulate her. He further claimed the grandmother had taped his mouth to her buttocks.

In October 2019, the mother once again took the children to the police station. She reported the children had said that, a few days before, the uncle and 19 of his friends had come to the mother's bedroom window. The mother had slept on the couch that night with a stomachache while the children slept in her room. The children said their uncle and 19 of his friends forced the children to stick their heads out the window and orally copulate each man. The men also urinated in the children's mouths.

An officer interviewed the children one at a time.  The officer noted the children looked scared of their mother and frequently glanced toward her when answering questions.  The mother told Z.S., "You better tell the truth this time," which caused Z.S. to become visibly scared and to avoid eye contact.  Z.S. was unable to answer questions about the details of what occurred and would ask what Q.B. had said.  The officer asked Z.S. if her mother had told her what to say, and Z.S. said her mother had " 'whooped' her the last time because she didn't tell the truth."  When asked what she meant, Z.S. said the last time her mother filed a report, Z.S. did not say what her mother told her to say and her mother physically hit her.  When the officer spoke to the children in the presence of  the mother, the mother became angry and corrected Q.B. when he said there were just a couple of men instead of 20.  The officer who interviewed the children contacted the Department to say she was very concerned for the children's safety.

A social worker went to the children's schools to interview them.  Q.B. repeated the story the mother had told the police.  He also stated his mother hit him with a belt when he did not tell the truth or did not listen to her.  Q.B. said his mother had hit him with the belt the morning after the alleged incident.  Q.B. stated his mother had said she hated him, which made him feel sad.  Z.S. also gave an account that largely matched what her mother had told the police.  However, when the social worker asked Z.S. what a "dick" was, she said, "I don't know.  It's poop," and could not identify where on her uncle's body she put her mouth to "suck dick."  Z.S. also reported her mother had used a belt on both Q.B. and her for not telling their mother the truth.  Z.S. said she and Q.B. had told their mother lies about sticking their heads out the

window, but when asked by the social worker if she were lying about the uncle coming to the window, Z.S. said no.  In a later interview, Q.B. denied his mother hit them with a belt.

The social worker interviewed the mother at the family's home.  She repeated the story she had told the police.  The mother showed the social worker the window the children allegedly stuck their heads out.  The social worker saw the window's security bars made it impossible to stick a head out of the window.  The window also faced a busy street.  When asked about the children's statements that she had hit them with a belt, the mother said she knew in the past she had admitted to spanking the children with an open hand, but she had never hit them with an object, so they were lying.  Previously the mother had denied using physical discipline.

The Department detained the children from the mother.  The Department placed Z.S. with her biological father.  Initially, the Department placed Q.B. in shelter care, but later placed him with a family friend at the mother's urging.

Q.B.'s biological father, who lived in New York, attended the adjudication hearings by phone.  He was interested in gaining custody of Q.B., and the court granted him visitation while the Department looked into possible placement.

Three days after Z.S. went to stay at her father's, the mother told the Department Z.S. told her that her father penetrated her with his penis.  The mother later said she had seen discharge in Z.S.'s underwear and this was a sign of sexual abuse.

After the start of the pandemic, the mother's visits with the children were by video or phone call.  Z.S.'s father monitored her

calls with her mother.  The mother said Z.S. did not need to listen to her father and made other inappropriate comments.

Q.B.'s caregiver monitored his calls with his mother.  The mother made inappropriate comments to Q.B.  She told Q.B. that, because Q.B. would not be there long, Q.B. should hit the caregiver's other children.  Q.B. did hit one of the other children, though he apologized and understood what he had done was wrong after speaking with the caregiver.  The mother also told Q.B. she would buy him things if he said he wanted to come back to live with her.  The mother called twice with her cousin and both pressured Q.B. to "pick a side."  The mother and cousin also told Q.B. not to call the caregiver "Auntie" and that her house was the "devil house."  Q.B.'s caregiver reported that Q.B. would become sad when his mother called.  At times his mother would upset Q.B. to the point that he would start crying and run upstairs.  Q.B.'s therapist stated Q.B. reported he did not feel like he could be himself on calls with his mother because he had to appease her.  When Q.B.'s therapist tried to discuss the issue with the mother, she denied saying the things Q.B. reported.  Q.B. also said his mother had told him she hated him, called him a monster, and told him he had a bad attitude even though "I don't do anything wrong."  These statements made Q.B. sad.

The mother attended therapy from August 2017 to April 2019.  She stopped when she completed her treatment goals.  She said she "did not find it useful as she did not learn much."  The mother resumed therapy in December 2019.  The mother saw a psychiatrist in January 2020 who concluded the mother did not need medication.

The mother's treatment goal in therapy was to "[i]ncrease task-completion (i.e. chores, appointments)."  When the

8

Department spoke to the mother's therapist, the therapist said she did not have any concerns about the mother or her behavior. The therapist did not see the petition in this case until several months after beginning to treat the mother. When a social worker asked the therapist to address with the mother her inappropriate comments on calls with Q.B., the therapist said she did not know how. She dismissed the Department's concerns and changed the subject to the mother's concerns about the children's placements.

B

The juvenile court held a combined jurisdictional and dispositional hearing. The mother, a social worker, and the mother's therapist testified. The mother denied all of the allegations and denied she had any mental health issues. The mother's therapist stated the mother had taken accountability only for placing the children in a situation in which the uncle and others sexually abused them. The Department called Q.B.'s caregiver as a rebuttal witness. The caregiver testified the mother had told her a therapist had diagnosed the mother with depression and bipolar disorder in the past. According to the caregiver, the mother said she was not going to tell the Department. The caregiver was coming forward now because she had seen how the mother's conduct was negatively affecting Q.B.

The juvenile court sustained four allegations as amended. The court sustained an allegation for failure to protect under section 300, subdivision (b) as to each child due to mother's physical abuse by hitting the children with a belt. The court sustained an additional allegation for failure to protect under subdivision (b), finding the mother showed mental and emotional problems, including bizarre and paranoid behavior, in subjecting

9

the children to numerous interviews with professionals relating to alleged sexual abuse, and this behavior harmed the children. Finally, the court sustained an allegation for emotional abuse under subdivision (c) as to Q.B., finding mother's actions in subjecting him to numerous interviews relating to the sexual abuse allegations and her statements to Q.B. caused him emotional distress and anxiety.

The juvenile court removed the children from the mother. The court noted the mother continued to deny everything. Moreover, she did not appear to have insight into or awareness of how she was affecting the children because she persisted in this behavior, including reporting that Z.S.'s father had sexually abused Z.S. The mother also continued to coach and manipulate the children inappropriately, even during monitored visits. The mother's refusal to recognize these problems and her persistence in this conduct put both children at risk of further physical and emotional abuse if they did not remain out of her custody. The court also ordered the mother to undergo an Evidence Code section 730 evaluation, to take a parenting class if one had not already been completed, and to engage in therapy with a Department-approved and licensed therapist. The court ordered the mother's visits to be monitored. The court continued each of the children's placements and ordered services for each father and visitation for Q.B.'s father.

The mother appealed.

At review hearings held after the mother filed her appeal, the juvenile court terminated the suitable placement orders and placed both children with the mother. At the mother's request, we took judicial notice of the juvenile court's minute orders dated November 17 and November 22, 2021. We asked for and got

10

supplemental briefing from the parties as to whether these orders mooted the mother's challenge to the juvenile court's dispositional orders.

II

The mother contends substantial evidence did not support the juvenile court's orders regarding jurisdiction or disposition. We affirm the order regarding jurisdiction. We dismiss the challenge to the dispositional order as moot and, in the alternative, affirm on the merits.

A

The mother argues substantial evidence did not support the juvenile court's exercising jurisdiction over Q.B. and Z.S. None of her arguments has merit.

We review the juvenile court's exercise of jurisdiction for substantial evidence. (*In re R.T.* (2017) 3 Cal.5th 622, 633.)

1

We turn first to the allegations involving the mother's physical abuse of the children. Each child repeatedly said their mother hit both children with a belt. It is true Q.B. also stated their mother had not physically disciplined them. However, given the evidence the mother was coaching the children, the juvenile court could conclude any denials were the result of the mother telling the children what to say. Z.S.'s exchange with a social worker corroborates this:

> *Social worker:* What happens when you get in trouble at home?
>
> *Z.S.:* I get a whoop- (child stopped in mid-sentence) I stand in the corner and get on punishment.

11

> [Social worker asked what Z.S. was going
> to say at first.]
>
> *Z.S.:* I get a whooping sometimes with a belt.  I
> get a whooping for doing bad stuff like
> waking mommy up.  [Q.B.] gets a
> whooping sometimes and he goes on
> punishment and goes in the corner or goes
> to bed.

The juvenile court found there was evidence of physical abuse "in that the children who are competent, they are verbal and able to recount, remain consistent, [made] plausible and credible statements about being hit with the belt."  We will not disturb this credibility finding.  (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011–1012.)

The mother suggests the children's credibility must be questioned given the evidence that they lied about certain things, including the fantastical allegations about cannibalism, satanic rituals, and murder.  The mother argues the investigators were not fully aware of or familiar with Q.B.'s diagnoses, so their questioning of him was inadequate.  However, that the children were sometimes untruthful did not mean, as a matter of law, they were always untruthful.  The juvenile court examined the context of each statement and evaluated consistency across interviews and between the two children's statements.  Substantial evidence supported the juvenile court's individualized conclusions.  Absence of physical evidence does not undermine this credibility evaluation.

### 2

We turn next to the allegation the mother has emotionally abused Q.B.  The thrust of the mother's argument seems to be

12

that she did not emotionally abuse Q.B. because she showed she was able to care for him by securing appropriate therapeutic care and services for Q.B. This argument misses the mark.

Although the mother did seek certain services for Q.B., she also refused mental health services immediately after the children's alleged disclosures in October 2019. The mother's reason was that she was trying to get money from a victims' fund to relocate and did not want to apply for services until the family had moved.

This argument misunderstands the basis for the court's ruling. The court did not premise its finding that the mother emotionally abused Q.B. on a failure to seek services for Q.B. Instead, the juvenile court looked at what the mother did and said to Q.B., whom she knew was suffering from emotional issues. The mother told Q.B. she hated him. She called him a monster. Q.B. said her statements made him sad. Q.B.'s therapist and caregiver each related that the mother said things to upset Q.B. on their calls. The therapist said, when Q.B. spoke to his mother, "fear is present" because Q.B. believed he had to appease his mother. The caregiver reported instances where the mother would say something to Q.B. that would cause him to run upstairs to his room crying. The mother also continued to coach and manipulate Q.B., pressuring him to "choose a side" and promising him gifts if he would say he wanted to live with her. The mother ripped up photo books Q.B.'s father had made for him. Q.B.'s father suspected the mother was trying to punish him by making Q.B. doubt Q.B.'s father's affection for him. Z.S.'s father reported the mother "scares the crap out of [Q.B.]" and that Q.B. "stays out of her way."

13

The juvenile court also found that the mother's reaction to the children's alleged report of sexual abuse harmed Q.B. The mother endorsed her children's account of abuse at the hands of 20 men outside the barred window, despite the fact the bars disproved the possibility of this attack. As the mother repeatedly had the children recount the story, it became increasingly outlandish.

The juvenile court noted, "This kind of behavior is familiar to anyone who has either read about the McMartin preschool case or watched the play The Crucible by Arthur Miller. It turns out that if you repeatedly ask children about sexual abuse, and you seem to encourage them to say things about sexual abuse, many children will provide increasingly elaborate and bizarre stories about sexual abuse by an increasing number of individuals culminating in [Q.B.] saying that the police sexually abused him, as well as his grandmother, his uncle and a number of their friends and his sister's classmates."

The court continued by observing the mother did not act reasonably in this situation. Rather, the "mother seems to have not only believed it but have encouraged the children to believe these things themselves, which is really the most harmful thing of all. That at one point the children themselves believed that these things had happened to them." The juvenile court noted that Q.B.'s statements highlighted the mother's role in encouraging the children: "My mom told me to tell the story, or I wouldn't get my tablet back . . . . If I told my mother it wasn't true, then I would get in trouble about lying." This conduct was emotionally harmful to Q.B.

The mother objects to the juvenile court saying what a "reasonable parent" would do, claiming it injects improper

cultural bias. The context of the court's comments makes clear the court was considering a reasonable parent's conduct to be equivalent to conduct that would not cause the children emotional damage. The court's analysis was proper.

Substantial evidence supported the juvenile court's conclusion that the mother caused Q.B. emotional harm. The mother's continued inappropriate behavior on monitored calls showed the risk of further harm continued through the time of the adjudication hearing.

3

Because the court properly exercised jurisdiction pursuant to the allegations discussed above, we need not and do not address the final allegation about the failure to protect based on the mother's mental and emotional issues.

B

In her appeal, the mother argues substantial evidence did not support the juvenile court's dispositional order. After briefing was complete, the court returned both children to the mother's custody and found the mother has substantially complied with court-ordered services. Counsel for the mother brought this information to our attention. In supplemental briefing, the mother did not address why her challenge to the dispositional order, separate from the jurisdictional order, merits review. We conclude the challenge is moot.

An appeal becomes moot when, through no fault of the respondent, an event makes it impossible for the appellate court to grant the appellant effective relief. (*In re Jessica K.* (2000) 79 Cal.App.4th 1313, 1316.) We dismiss an appeal where reversal will have no practical effect. (*In re Dani R.* (2001) 89 Cal.App.4th 402, 404.)

15

That is the situation here.  The mother sought to have her children returned to her, and they were.  The mother provided no specific arguments against the ordered services and is now in substantial compliance with those services.  On these facts, we can provide no further relief.

In the alternative, we affirm because substantial evidence supported the juvenile court's dispositional order.  Our inquiry is whether the record contains substantial evidence from which a reasonable fact finder would conclude it is highly probable a fact is true.  (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011–1012.)

The mother argues the children should not have been removed because she had sought proper services for the minors and provided for their basic needs, so any risk was speculative.  The record is to the contrary.

The mother continued to deny wrongdoing or hitting the children, despite their reports to the contrary.  She did not show insight about her role in encouraging the children's reports of sex abuse and other allegations.  Instead she continued to coach and manipulate them.  This provided substantial evidence to support the court's conclusion the children would be at risk of physical and emotional harm if they remained with their mother or had unmonitored visits.

## DISPOSITION

We affirm.


                                                            WILEY, J.

We concur:


        GRIMES, Acting P. J.                    STRATTON, J.

16